Good morning, Your Honors. Thank you very much. Could I reserve five minutes? You certainly may. Watch the clock and keep track of your time. I'll do my best, but I fail every time. I'll let you know. My name is Dennis Moran. I'm representing Kiribati Seafood Company. I'm also here representing ISI, the insurance company. It's my ISI hat on. The reason I'm in that capacity is because Kiribati Seafood Company, during the course of this odyssey, acquired the ISI subrogation claim, to assert that against Morisco. There are a lot of twists and turns to the facts here, several legal issues, more than several legal issues out. I don't usually like to do this, but please, if there's whatever the court needs to focus on, please bring that to my attention. I'll start you off. In my other life, I was a business lawyer, and so this is an interesting business case. As I looked at the record and as I looked at the briefs, I was struck by the fact that the work at Morisco seemed to be a T&M contract. Nobody seemed to know how much time it was going to take, how much it was going to cost. But whatever else happened, before the ship was released, a note was signed. That note represented something. What did it represent? That represented a compromised amount due for the work done in the shipyard. So it was an accord and satisfaction? It was absolutely an accord and satisfaction. That's the way it was pleaded in the initial complaint. Now remember, this case was started when Morisco sued Kiribati for nonpayment of the $200,000 note. That was the first lawsuit in this case. That's why I, we're both trial counsel here today, that's why I, Kiribati's counsel, I didn't go first, I went second. And that's why all of the argument, the initial pleadings all dealt with the note. And all of a sudden, you have an expanded, I guess you'd call based upon notice, pleading, the concept that there was work that had not been paid for that needed to be taken into account by the district court. Is that right? Well, yes. And let me describe very particularly what happened, because that is a really important part. It was a very difficult surprise for us. This case was initially filed by Morisco, and the note claim part of it proceeded. We had, there were four continuances, I think, where we ramped up to trial a bunch, and I think that was very much what caused this thing to go wrong when it did. But we had a discovery cutoff and a motion cutoff date in, I think it was January of 2004. We had our last motions from the motion cutoff date heard in February 2004, which were our Daubert motions. Now, up to that point in discovery, not a single word had been said about these additional charges, about converting this $200,000 note claim into a free-for-all with all the shipyard expenses claim. We relied on the discovery, which was said in several places, this $200,000 note case, don't go into the backup, which we would normally do in a business case or a contract case. You say, okay, you've got $700,000 and we don't have any change orders. Let's see what you did and make sure you didn't pad your subs and things like that. We didn't do any of that because none of that was in the case until we virtually showed up at trial in July 2005. If this was an accord in satisfaction, and by that I'm meaning that you take the bundle of rights that Morisco had and the bundle of obligations that your client had and you settle on an amount in settlement of all the claims and you put it in a note, is that what happened here? Well, that's what happened with the disputed amount on the bill. Right. Okay. They said, you know, my client goes in and says, well, you bid this thing at $325,000 on the front end, all in. Okay. And Mr. Anawati at Morisco says, no, that was $325,000. There was a misunderstanding. We had a whole bunch of oral change orders, la-di-da. Usually they're shipyard contracts, but there weren't any here. And so client shows up, care body shows up. They argue over some of the items in the bill and they say, all right, let's just call it $200,000 total. So I think all in it was about $425,000 because there had been some prepayments. They said, okay. They came to an accord and satisfaction and said, Morisco says, we can't really document things we don't want to or whatever. Okay. Was there anything out of Morisco, any work done in the shipyard at that point or at the time the ship was released, that was not included from your perspective in the note that represented the accord and satisfaction? Well, let's be clear. The accord and satisfaction was simply the amount of the charges. Right. Yeah. But it was, what shall I say, it was memorialized in the note. In the note. Yeah. So this is the bill and you pay the $200,000 and we'll agree on that number. No. Counsel, what... Go ahead. That was it. What troubles me about your argument, and I assume you're saying that this is just a case about the $200,000 note. What about paragraph 19 of Morisco's complaint? 17 raises the note. 18, I assume, is kind of related to the note. But what about 19? As an alternative claim and without waiving its lien, Morisco alleges that the owner would be unjustly enriched if he were allowed to retain the benefits of the repair services without paying the value of those services. Isn't that direct notice to you that Morisco does not concede accord and satisfaction and is making an alternate claim to the entire amount? Well, it might be, just looking at that. And I don't have the complaint handy, but I remember that. It might be, but it might not be. And I'll tell you how you figure that out. You send discovery and you say, okay, send us all your billings. And I put this in my opening brief. Morisco comes back and says, our billings are irrelevant. All our backup is irrelevant. This is only about $200,000. That's the discovery we sent. That's how they responded. Now, if this case converts into, no, we're going to seek the $700,000, I mean, how many ways do you want to look at it? They've got a duty to supplement the instant they decide to change their mind because that discovery response is no longer accurate, okay, which makes all of their backup billings now in play. They've got to give us notice of that. So your argument is they're bound by their response to that discovery request. Well, they're bound until they decide to change it. If they, sometime before the discovery cutoff, say, you know what, let's exploit that little opening we had in our pleading and let's change our case to include the whole $700,000. Then all of a sudden, boom, they've got a CR 26E, I think, duty to supplement their discovery, change the prior discovery response because now every bit of that backup is in play. They've got to produce it. They've got to tell us about it. And if they're going to do it and not produce it, we've got to at least know about it so we can go to the court and then file a motion to compel because it obviously becomes relevant. Mr. Warren, from your point of view, just speaking factually now, how did this case change metamorphosis from a case involving a claim for the $200,000, which was the outcome of the accorded satisfaction, to a claim for the $700,000-plus for the repair cost? Here's factually how it changed. We got through our January-February 2004 discovery cutoff-motion cutoff period. Who was the presiding judge then? That was Judge Ezra. And it was Judge Ezra, I think he had a schedule, our second trial was scheduled for March-ish. Our third trial was scheduled for October-ish of 2004. We got up to 2004-October. We got another continuance after we'd ramped up. And then I believe in December 2004-ish, after we got yet another continuance, there was a supplementation to a prior response that simply said, now we're claiming the full $700,000. What do you mean by supplementation to? The Morisco sent an initial disclosure supplementation saying, by the way, every cutoff has passed, but now we're going to ask for the full $700,000. What was that initial disclosure? What kind of disclosure was required? The initial CR 26 disclosure is at the very beginning of the case where you disclose your claim. They disclosed, they said, we're looking for $200,000 on the note, period. So there was a supplemental Rule 26 disclosure. In December of 2004, I believe. And that's beyond every motion. And that said, in effect, we're claiming $700,000 plus. Yes. So what did you do in response to that? Well, we had a judgment at that point. What do you mean we had a judgment? Well, we, Carabati Seafoods, we had a judgment to make whether we were beyond every conceivable motion date. We can't come into court now and say, well, let's move for summary judgment on this claim that you just now told us about. We can't really send any discovery under the rules because we're way past the discovery cutoff. Unless we go in and file a motion to reopen discovery, which means we're going to have a new trial continuance. Now, this is our fourth. My clients are wiped out financially by this point. The boat's still to this day sitting down in Tahiti. And so when I say they're faced with a choice, they're faced with a choice to sit there and say, we have got to get into trial to try to get some justice here because every year we go, we're just, you know, my guys are in, they're wiped out. And if we bite on this hook, this new claim that they threw out and go say, okay, we've got to reopen discovery, boom, we're kicking another trial date out another two years. So that's what I said. We had a judgment to make. And the judgment we made was this. And I'll stand up and I'll say it. The judgment we made was to simply walk in when the time comes and say this claim was never properly pleaded, discovery was never produced on it, and stand on that and stand on the requirements of CRT. All right. So you got this disclosure. When again? I believe it's December of 2004. Okay. So you did what then in response? In response to that disclosure, we decided to. I know, but when you actually did something, when and in what context was it? It would have been in the mail. In the mail you did what? It would have been some document we received from them in the mail. So what did you do in response? You said you decided to wait it out until a certain date and do something. We decided to file a motion in limine to say that when we actually got to the trial. When did you file the motion in limine about roughly? Oh, I have to go back. It was after we had a conference with Judge Rafiti, I think who got appointed in February, March of 05-ish. He set a motions in limine deadline and we filed it according to his motion in limine deadline that he set. So sometime in March of 05 probably? March or April of 05, yes. Okay. You filed this motion in limine. Yes. So that was your response to this supplemental rule 26 disclosure. Yes. All right. And then to that motion Judge Rafiti says, this is not an in limine motion, right? Something like that. A couple days before trial he said, yeah. And he never really addressed the merits of the motion. No, he said this claims fair play. So he said you're trying the case. Okay. We're trying the case. All right. So that's the way as far as you know the claim got back into the case. Well, that's how we tried the case, yeah. Well, I know. But at that point did you say to Judge Rafiti, well, then we need discovery on all the bills they're going to submit and all that. I made the argument to Judge Rafiti several times in the trial. I said this is unfair, it's late, and here are all these reasons. Judge Rafiti jammed us from a scheduled five-week trial into what he told us at the beginning was going to be one day. Now, he made it very clear. But he became generous and gave you two. Yeah. And I was worried I was going to get sanctioned for going that far. But, no, he pushed this thing very quickly, and I think we cut a lot of corners that ended up with my clients not getting their fair day in court. And that's why we're here, because of many of the things we've set out in our brief. But you didn't ask for discovery on the bills or anything like that. No, because I'll tell you why we didn't. Because if we did, we were going to be another year plus going to trial. My clients came. We were four years in. No, you didn't. No, we didn't. But we deliberately didn't. It wasn't a mistake. I chose not to do that. I understand that. It's the lesser of several evils at that point. So the claim of error is what? That he should have, he meaning, I guess by this time be Judge Raffiti, should have stricken the expanded claim? Yes. Very simply. If you're going to make a claim and you're going to change it, you've got to supplement your discovery under CR 26E. There's no variance to that. What he essentially did was said, well, I don't care about the CR 26E rule to supplement discovery. That didn't apply. I'm going to try the case anyway. And that's the point we made. We said, if you're going to bring the claim, you've got to go back and supplement your discovery. You don't just get a pass. And he said they did. Was there any testimony in the trial about the accordance satisfaction issue? No, because it wasn't, the accordance satisfaction really didn't become an issue until, and it's one of the things I pointed out to him. I said, look, if they were claiming the 700 and the 200, we would have said, well, we'll put on an accordance satisfaction defense on the 200. We would have pled it in the answer. But when you're going to walk in a trial and they're all of a sudden going for the 700, I told him, I said, I don't even have an opportunity to depose Mr. Onowati on the accordance satisfaction issue or present any evidence or even build a case on the accordance satisfaction issue. Was there any testimony about what the note supposedly represented? Yes. Yes, there was. Mr. Onowati testified and Mr. Krovo testified. It's in the record. They said this was the number that they agreed because there was a dispute over how much the shipyard bill was. Okay. Again, as a former business lawyer, this is very strange to me. Because I understood your earlier comments. The parties had a dispute about how much was owed to Morisco before the ship left the dry dock. Yes. And Morisco said it was $400 or whatever. $700. $700. Yes. And you all said it was something else. A note was signed in settlement, as I gathered, for $200,000. It wasn't the only thing. It was not. No, no, no. There was about $325,000 cash paid. Oh, right. No, I understand that. Okay, plus $200,000. The cash plus the note was supposed to take care of everything. The bill. Well, plus being named as the additional insured? Yes. To secure the future payments? Well, the lost pay, the additional insured. Just in case the boat sinks, you guys aren't going to run off with the insurance money, that sort of thing. Commercially smart stuff. I want to get to that point. I don't know how much time we have left. I'm into my five. You're into your five, and I think you might want to say something. I have another issue, but go ahead. Let me just ask one question on this issue now. Were you – well, first, did you claim Judge Rafiti erred in the way he dealt with the lost payable endorsement issue? No. I think he dealt with that just fine. So the outcome of that is not something you're complaining about on appeal? Well, no, they're appealing. No, I think it's a no blood, no foul kind of a deal. There's no breach because it didn't matter. All right. Thank you. Do you want to say something about the subrogation issue and why this shouldn't be mutually wiped out? Okay. On the subrogation issue, it has several aspects. Let me see if I can – Cure Body Seafoods acquired the ISI subrogation claim. ISI paid $804,000. Judge Rafiti got it wrong, which is why – this is a big problem. Judge Rafiti – we put up two people to try to explain these line items of damages. This is how we do it. Here's the line item of damages. Sue Goheen gets up there. She's going to go through and explain them. Judge Rafiti says, I don't want to hear it. We said, well, we've got to show it's reasonable and necessary. I don't want to hear it. Then we put up Mr. Carmack, who's going to go through the same thing, and Judge Rafiti makes it very clear, you don't want to hear that kind of stuff, okay? We put it up. Then what happened is Judge Rafiti went through that line item himself, seized on one of them. There was no testimony about it. He says, I don't like the looks of this. This makes the whole thing look bad. Now, if we were in front of a jury, this would not have happened. We would have been able to put on our case, explain our numbers, and deal with any kind of issues, secret issues that people might pop up with, and it should not have been different with the judge. Judge Rafiti should have forced himself to sit there and listen, or if he had questions about a line item, he didn't have any problem asking witnesses things. I mean, if you've read the record, he asked almost as many questions as I did. On the subrogation, that was a straight no blood, no foul. If my client, Care Body Seafood, had added them as an additional assurant to this policy, and this is AIH-77, the Ninth Circuit ruled on another case I had with the AIH-77 form. It's a very standard form. Then the shipyard claim would not have been insured. It would not have been subject to coverage. So Care Body Seafood would have put the claim in. ISI would have denied coverage. Care Body Seafood would have just sued for those exact same damages on its own behalf, so it wouldn't have made a difference. And Judge Rafiti did recognize that fact of it. A shipyard simply can't insulate itself, and there's a whole history of that being tried with shipyard contracts and so forth. Did you give a certificate of insurance? Yes, that showed lost payee. Right, exactly. And they accepted that in the testimony of the trial. They accepted that, and we said it was the best we could do. Mr. Krobo said it's the best we can do. They're not going to accept an additional insured. Is that standard in the industry to give a certificate of insurance as opposed to amending the policy? You can't amend the policy, commercial marine policy. You can add additional insureds, and then you can redefine what they mean. You could add lost payees. Well, is the certificate the same as adding an additional insured? No, it's not, and I've litigated a case about that. I think I almost got here. No, it's different. A certificate, the policy is the policy. Because Marisco was saying, and one of the issues we have to decide, is whether or not they were prejudiced by failure to be named as an additional insured. Well, and they're not, because if they had been named additional insured, and I'm running out of time here, but let's walk this through. Suppose we walked in and we did get this certificate that nobody else can get that says the shipyard's an additional insured under the Hull policy. Nobody can get it. It's not done, but say we got it, and they're written down there. Now, claim is the rudder falls out. Care Body Seafoods calls ISI, says, ISI, cover our loss. We're sitting on an island dumping people off all over the Pacific trying to get things fixed. ISI looks at the policy and says, well, wait a minute. No, we're not going to cover this because we have an exclusion at line 83, I think it is. It says, if the loss was caused by work in a shipyard, we don't cover the claim, period. So ISI would say, no, Care Body, you've got to pay for this out of your own pocket, and then Care Body then goes and sues Morisco for exactly the same thing on its own behalf. So there's no way that Morisco could have had the benefits that somebody else normally gets as an additional insured, like you do it on aircraft and cars and things like that, but it can't be done in shipyards with that exclusion in the policy. If they said, we want to be an additional insured under a different policy without that exclusion, then their argument makes sense, but they weren't, and there is no policy without that exclusion. That's the AIH-77 form and standard. I'm over time here now, so. Our questions took you over time. Thank you very much. We'll now hear from counsel for Morisco. Thank you. Counsel, you may proceed. Thank you, Your Honor. I guess I ought to begin where Mr. Moran left off, and that's by discussing perhaps in no particular order of importance the accord and satisfaction issue, which the court asked about, and then the breach of that contract, the breach of that agreement in every respect by Karabas KSC. While most of what counsel has said about what occurred is true, Your Honor, almost none of it is accurate. And I think that the- That's a fine distinction. Your Honor, it's not one I'm sure I can always make. It's not almost political. Your Honor, I think that like with politicians, what's left out is often more important than what's included, and what goes unsaid can be more significant than what is said. Like a negative policy pregnant. Uh-huh. Whatever that may mean, Your Honor. But having stayed up all night prepared to talk about superseding intervening cause, I now shift gears to talk about accord and satisfaction, Your Honor, and I'm not a business lawyer. But I do know that accord and satisfaction is a term of art with particular meaning in our business, and I also know that I have heard it for the first time in this case this morning. And I think that the court's familiarity with this record and its review of these briefs will show that accord and satisfaction was never an issue in this case. Well, if it's not an accord and satisfaction, what would you call this? I'll call this agreement that was reached that included this. It was never called accord and satisfaction, Your Honor. Under the circumstances of the case, as kind of a living, breathing organism, it evolved from the original set of circumstances of that note to the more mature organism at trial where everyone understood, certainly KSC, Karabas understood, that Morisco was seeking full reimbursement for the work that it had done on the MADI. Now, is that sourced in paragraph 19 of the complaint? Not only in paragraph 19 of the complaint, Your Honor, but in Morisco's pre-trial brief it stated that it wanted the recovery of all of its repair costs and was seeking them, and that's in volume 1, page 87 of the record. Page what? Page 87, Your Honor. In its trial brief, Karabas, acknowledging that, recognized that Morisco was seeking full recovery of repair costs. That's in volume 2, page 332. What did your client think that the note represented? I think your opposing counsel mentioned something like $300,000 in cash and then the note. What did your client think the combination of those two things meant? My client thought, Your Honor, not quite so deeply or so legally as we do in the rarefied atmosphere of this courtroom. My client thought that it was trying to help a customer who claimed it was unable to pay for the full amount of the repairs that had been done. I understand, but what did it think the cash and the note combined meant? It meant that it was going to get at least $200,000 in, I think, monthly payments of $12,000 to $16,000 with interest to pay that portion of the bill which they had agreed Karabas would satisfy. Why wasn't that just a settlement of the whole deal? I don't know if that ever occurred to Mr. Onwati, and I think that once it became clear that Karabas was never going to pay anything, that the breach was total and complete and voluntary and intentional, that Morisco sought, and the court recognized the validity of its seeking, the full amount of the repairs that it performed. Let's assume for a minute, arguendo. Let's assume that opposing counsel's client faithfully paid every nickel under the note. Would your client have been fully satisfied there would be no litigation? Putting aside what happened later on, but just so far as the dock repairs are concerned, would it have been fully satisfied? I would have to assume, Your Honor, that he would have accepted that he couldn't do any better. That means fully satisfied. That's what we call it. That's what lawyers call it. I understand your client didn't call it that. Does that constitute a court in satisfaction? Indeed it does. Your Honor, it doesn't within the textbook sense. I don't know that it does within this litigation. Whatever we call it, let's call it whatever. We can make up some name for it. But the fact is that for purposes of this court, I'm understanding you to say, which I also understand from the record, that the combination of the cash and the note, had the note been fully paid, your client would have deemed itself fully paid. Is that correct? I can't speak for Mr. Anwani, but I think that it's fair for me to say yes. Now, that was an issue that was never breached at Congress, and he was never asked. But it's certainly fair to say, your Honor, and true, that when that vessel left the shipyard, Mr. Anwani believed that he was going to get paid regularly on a $200,000 note, and he believed that he was going to be an additional insured on the policies of insurance on the Maddie. What about the argument that your opposing counsel made about the exclusion in the policy? Do you disagree with him about that? Entirely and completely. And I also disagree as to the relevance. It's not only speculative and purely argumentative, your Honor. It is the worst sort of adventure into waters that were both uncharted and unsailed in this trial. The ship did a lot of that. I'm sorry? Yeah, absolutely there was, your Honor. All we know is that there was an absolute breach of this so-called agreement between KSC and Morisco. They did not pay on the note and never meant to, as subsequent events proved. They did not name Morisco as an additional insured. As a consequence of that, we face a claim not from KSC, as they so glibly say, but from ISI. Had Morisco been an additional insured on the ISI policy, this subrogation claim would not exist. Now, how many angels can dance on the head of a pin? Whether a cow could jump over a moon, your Honor, I don't know. I haven't seen this policy form. I don't know its contents. The insurance company may not have been able to sue. That's correct, your Honor. But would not his client have still been able to sue? I'm certain that they would have, your Honor. So, where's the loss? I mean, where are you injured by the failure to have a subrogation of the insurance policy, other than the party suing you? But the party suing me, your Honor, may be a technicality in some senses. But again, in this courtroom, those are the sorts of technicalities that lawyers deal with. And those are the sorts of technicalities that determine whether or not a cause of action exists or could only potentially exist. There may have been a potential cause of action for KFC. There is not. Well, by definition, the subrogation means that the party that is subrogated stands in the shoes of the person as to whose claim you are subrogated. That's correct, your Honor. So you have the initial party that still would have the right to sue your client. And your client, if it was liable for something, would still be as liable as it was before, wouldn't it? Would it be, your Honor? Because it would be an entirely different set of circumstances. If this weren't the insurance company funding this adventure, one has to ask whether $804,000 would have been spent to do $12,000 worth of work. One would have to ask whether or not a vessel that was close to Guam would have ended up in Tahiti. One would have to ask whether or not they would have spent the exorbitant sums of money they did without ever repairing the vessel. All of this Judge Rafiti found to be peculiar, and we find it as well to be... So you're arguing foreseeability on the other side. Your Honor, I have no idea what foreseeability was in this particular case, but I know that there's nothing foreseeable about what would have happened if we had been named an additional insurer in this policy. Except that we would not face a claim from ISI in this courtroom today. Mr. McCalpin, let me get back to this accord and satisfaction or settlement agreement or whatever it was. But what is your response to Mr. Moran's argument that, well, your response to all of his discovery requests was that, well, inquiring into the bills of all the repair costs at your dry dock or your shipyard was that, well, it's not relevant because we settled this for that $200,000. And you didn't permit him discovery of any of that. Your Honor, the court governs and controls discovery. It was known almost ab initio in this case. But is it true you did produce that? No, that's not true. I don't know how much, Your Honor. My memory does not take me back to this. I do know that, again, the record will show in Volume 1, page 341, that Curabati concedes that Morisco did, in fact, produce documents regarding repair costs. I do know they filed a motion in limine on this, showing clearly that they knew they faced exposure for the full amount of repair costs and that Judge Rafiti denied that motion. But that was after... Let me explain it without... No, no, wait a minute, wait a minute. That motion in limine was just a few days before trial, right? It was decided a few days before trial, that's correct, Your Honor. It was not during the course of discovery. Your Honor, they had, I think, the option of asking the judge to reopen discovery or to compel discovery or, in an alternative, Your Honor, present at trial was not only Mr. Anwadi, but present at trial were all of the principals of the KSC Corporation who had something to say about these costs and about the repair work done. They were questioned about it and could have been questioned at length about any aspect of it that they chose to reveal. Which brings us to kind of the second point, Your Honor, the complaint by counsel about the way Ms. Goheen was treated. Speaking of no harm, no foul, Ms. Goheen, who's painted as if she were some sort of important witness here in the subrogation case, by that point, all that was being explored by the court and by counsel was the reasonableness of the amounts spent on repairing the Maddie and Tahiti. Ms. Goheen was, respectfully, a minor functionary with an insurance company in Seattle who never left her desk. She never boarded— I would have spoken highly of you. I'm sorry. We're very close, Your Honor. We're very close. You stick close to your desk and never go to sea, and you can be Admiral of the Queen's Navy. This is a woman whose only job was to collate information on repairs and expenses sent her by KSC and generated by KSC. She wasn't a primary source of anything. She didn't have any firsthand information of anything. The people who generated the documents that she put onto the sheet and then either paid or didn't pay were all in the courtroom, and they were primary source materials. So the fact that Mrs. Goheen was either not treated politely or not allowed to testify as long as counsel would have liked her to made absolutely no difference in the court's examination of the repair records and the reasonableness of the cost. And again, I was in a different courtroom, perhaps, but it seemed to me that counsel was allowed to examine his marine surveyor, his captain, his principal, and Ms. Goheen at length, and at the end of each examination, the court said, Do you have any more questions, counsel? And counsel said no. So he hadn't had a chance to do any real discovery about what the underlying work was that had been done on the ship, did he? Your Honor, I think he certainly had the opportunity to cross-examine Mr. Anawati. No, no, I'm not talking about the cross-examination. I'm talking about the discovery to get the records of your client about the work that was done. Your Honor, I believe that as Mr. Moran graciously conceded today, that was their decision. I understand that, but his side was deeply prejudiced, was it not, by his inability to do the discovery? Absolutely not, Your Honor. They had understood for quite some length of time that this was going to be an issue at this trial. They understood. Where did they understand that from in the records? The pre-trial brief, our pre-trial brief, their pre-trial brief, the motion to eliminate they filed, and the discovery. That occurred fairly briefly before the trial, did it not? I don't recall. Oh, I think the pre-trial brief was quite some time before that, Your Honor, perhaps a year or more. Because of the continued trials? There were a number of continuances, and Judge Rivitti, no good deed goes unpunished, came over to help Judge Ezra with a crowded docket and ends up stuck to this like someone did. This case feels to me like one where your client, when he got stiffed on the note, said, go get those people. Is that what we're talking about here? Your Honor, I think that would be the natural reaction of most businessmen. That's what happens. Stiffed on a $700,000 bill, yes, Your Honor. Okay. And then 10 months and 3,000 miles later, the vessel is destroyed on a marine railway in Tahiti, and we're told that we're going to be held responsible for 15 years of lost profits in some sort of speculative fish inventory, which absolutely bowled my client over, Your Honor. He likes Hadley v. Baxendale. We all do, Judge. Thank you very much. Counsel, I want to ask you about issue number six in your brief. That's the one that involves the $189,000. Do I have that correct? I believe so, Your Honor. All right. And what is your argument with respect to this? Your Honor, my argument is... It's like a cross-appeal in a way. Exactly, Your Honor. If Karabati had done what it promised and named Morisco as an additional insurer on the ISI policy, it's a fundamental premise of insurance law that an insurer cannot sue its own insurer. So ISI would not be able to subrogate against Morisco. Therefore, we believe that the proper measure of damages for the breach of their contract, an admitted breach by KSC, is that we should be entitled to an award offsetting anything we have to pay ISI. It seems to us there's an equitable symmetry to that. We face this claim from ISI only because of the breach of KSC. So KSC's damages should be whatever we have to pay ISI. What was Judge Rafiti's error specifically? How does that... Judge Rafiti's error specifically was buying into, and that's the wrong way to put it, was accepting the illogical logic of this chain of, well, then we would have, and once we had done that, this is what would have occurred, and I can tell you what's in that policy, which is not in the record. And please believe me, this is insurance law, and the end is, as counsel says, no blood, no foul. I couldn't follow it then, Your Honor. I can't follow it now. But basically what KSC is trying to say is, well, then we'd have reached our own pocket, and we would have paid for it, and we would have sued you, and so you would have owed us what we owe you, so that kind of washes it all out. And I think Judge Rafiti, by now being both tired and feeling a bit beleaguered, accepted that. We believe that it was an acknowledged and proven breach of contract, that there are damages for breach of contract, and the damages in this case should be, because they're both foreseeable and normal, that KSC owes us what we have to pay ISI. Because remember again, although we've been told there's an assignment, and we've been told that Mr. Moran wears both hats, and I believe he does, just because there's one counsel here, there are two different distinct legal entities. There is ISI and there is KSC. ISI has sued us. I don't know what would happen if KSC sued us. But you substantially prevailed in the district court, and if you prevail on this cross-appeal, is that an offset against the damages you've been granted? How does this play out? I can't think that far ahead, Your Honor. I'm just trying to think this morning. Your Honor, I hope it plays out well for everyone, but I can't predict that. Okay. Well, I'm just kind of trying to get my hands around the issue. Your Honor, there are a lot of issues in here. For what was an awfully romantic-sounding case when it started, it ended up being a briar patch and not the smooth sailing we'd hoped. Are there any other issues the Court would like to discuss? I have one question. I had asked Mr. Moran about the certificate of insurance. Do you agree that a certificate of insurance showing your client a lost payee was provided? There was a certificate of insurance provided that shows that, Your Honor. Okay. And Mr. Moran was accurate. And do you also agree that to get an insurance company to change the policy in the time framework involved would have been extremely difficult?  Your Honor, I represent insurance companies bringing insurers every day and have for the last 39 years. Many of them have provisions in the policy as a condition of placement that you can have blanket additional insured and lost payee endorsements. It's not a change in the policy. It's an endorsement to name an additional insured or an additional named insured. It's a routine courtesy. Sometimes there's a small fee. Sometimes there isn't. Okay. Let's assume for a moment that that didn't exist in this case in the policy. It didn't, Your Honor. According to the record, what was specifically agreed to by Mr. Moran's client? What did they agree to provide to Morisco by way of a lost payee coverage? Did they agree to provide a certificate? Did they agree to amend the policy? What did they do? They agreed to provide them that protection, the coverages and the privileges, that one who is an additional insured and a lost payee would be entitled to. Now, evidence of that would be the certificate of insurance. Was this documented in any way in the record? Yes, Your Honor. That's in the record. And, again, as Judge Rafiti correctly says, it's not disputed by KSC that they told Mr. Anawadi that they would make Morisco an additional insured and a lost payee. They were successful in making Morisco a lost payee. They did not make Morisco an additional insured. Now, whether that's because they couldn't or because they didn't, again, it's not altogether clear. Where in the record is the agreement that says they're going to do that? I don't know, Your Honor. I haven't seen that. I'm interested in that because my perception is, from the record, is you're dealing with relatively unsophisticated, non-legal type people who are dealing with this and somebody says, I want to be a lost payee, and they give a certificate of insurability. I want to be sure that the record specifies to the level that you're talking about that there was, in fact, a meeting of the minds on that issue. I think there was, but also I think, Your Honor, Judge Rafiti, in deciding some of these motions, made an excellent point. Whether or not Mr. Rafiti fully understood the benefits that he would obtain as an additional insured isn't really material. Morisco, the corporation, is entitled to the benefits it bargained for when it reached that contract with KSC. And that's what I'm looking for. What did the contract specify? If the court will indulge me, we will supplement our brief. Would you please, a 28-J letter on that issue? I certainly would, Your Honor. I'd be interested in having Mr. Moran, if you have any disagreement on that, I'd like to see, but maybe the two of you could both provide your common agreement on that point. Mr. Moran owes me dinner. Your Honor, Mr. Moran keeps dodging me for dinner, and so I hope that at dinner we can go over this. If there's anything else I could address, otherwise I've got a big slide. In terms of mechanics, it would be appropriate, if you both can agree, to file a joint supplement. I'll be happy to do that. Set this out that you both agree. If you can't agree, then we'll allow you to file what you would like to do, and we'll give Mr. Moran 10 days to respond. This says it's in the note passed by my co-counsel. Oh, it's in the note. It must be in the note. Okay. Thank you. Mr. Moran has some more comfortable shoes than I do, Judge, so that's why he can come up and stay up here longer. Mr. Moran, our questions took you over your time, and you tried your best to reserve some time, but we'll give you one minute to respond if you care to. What kind of shoes are you wearing, Mr. Moran? He's teasing me about them. I use back pain shoes. I'm trying out. My back hurts. They seem to work, but I'm taking heat. I'll tell you where it is. CARE Body filed a summary judgment motion to dismiss that claim, and so it's in the briefing on that summary judgment motion, which is in the record. In fact, I took Mr. Anawady's deposition, and I asked him, because what we're really getting at here is, is Morisco looking for a negligence waiver? I mean, that's what they're looking for. Call it an additional assured subrogation. Maybe that's what they're really looking for. And I asked him flat out, and it's in the record, the attached briefing to that motion. I said, were you looking for a negligence waiver? And Mr. Anawady says, absolutely not. I'm not looking for a negligence waiver. So that's in the record, our motion, CARE Body's motion for summary judgment to dismiss that claim. Let me step back for a second and use my last ten seconds. We're losing perspective on this case. My clients invested their lives, their fortunes in this boat. They went to Morisco to get a rudder. They almost died out in the middle of the Pacific. Their business is wiped out. People were on an island. They thought they had good work done. They thought they had insurance. They are cooked because this rudder was put in wrong. They didn't do anything wrong. They didn't pay the note. They didn't pay the note, but their boat was sunk in the middle of the Pacific. Is that why they didn't pay the note? Well, they missed the first two installments. But insurance, heck, was why they didn't pay it later because they didn't have any income. The lost payee they did live up to because every payment that ISI made, Morisco signed off on. So that was in. When was the first payment due vis-a-vis when the rudder fell off? They missed two payments. So walk back from December be November, October. So it was October, November they missed, and then December 7th. So when the rudder fell off, they started paying the note? No. The rudder fell off. They didn't even know about it until the boat got to Samoa, and then they went and said, you guys put a rudder in that was bad. We're not paying you the note. I might have done it differently. But the boat was broken, and the guys who broke it, they didn't think they should be paying them the money until this thing was settled. And that's the human part of this thing. My guys didn't do anything wrong. They're wiped out. They want their day in court, please. And your guy is the insurance company. My guys are the guys who were wiped out financially because of this, and they didn't do anything wrong. Half of your guys are wiped out. Well, my guys. Well, thank you, counsel. The parties will have 10 days from today to submit anything additional along the lines that have been discussed during your argument. With that, the case just argued will be submitted, and the court will adjourn.
judges: O'scannlain, Tashima, Smith